## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISIC

| | | |
|---|---|---|
| BALSHE LLC and THE SIMON LAW FIRM, | ) | 12CV966 |
| | ) | JUDGE ZAGEL |
| Plaintiffs, | ) | MAG. JUDGE COX |
| | ) | |
| v. | ) | |
| | ) | **COMPLAINT** |
| ALAN J. ROSS, SAVE ASSOCIATES, and | ) | |
| THE MEYER-CHATFIELD CORPORATION | ) | |
| | ) | |
| Defendants. | ) | |

**FILED**

FEB 1 0 2012

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

Plaintiffs allege:

### OVERVIEW

1.      Plaintiffs have paid defendants Alan J. Ross ("Ross") and SAVE Associates ("SA") (SA and Ross together, the "Ross Defendants") *twice* for the *same* patent. Now, more than three and a half years after the parties entered into a settlement agreement that was supposed to conclude litigation between them, the Ross Defendants still refuse to transfer their interests in the patent to Plaintiffs. Meanwhile, Plaintiffs have spent over three years and almost $2 million trying to develop business opportunities to exploit the Patent. The Ross Defendants' recalcitrance continues to injure Plaintiffs by curtailing their ability to implement their business plans and adequately defend their intellectual property rights.

2.      There are two agreements concerning which Plaintiffs seek various remedies:

(a)      Plaintiffs seek to specifically enforce an Agreement for Purchase of Pooled Benefits Trust Patent No. 5,974,390 entered into April 2008 (the "'390 Patent Purchase Agreement"). Plaintiff also seeks an injunction prohibiting the Ross Defendants from transferring other otherwise encumbering patent number 5,974,390  (the "Patent") until Plaintiff's claims can be fully adjudicated. (A true and correct copy of the '390 Patent Purchase Agreement is attached as **Exhibit A**.)

1

(b)     Plaintiffs seek rescission of a Settlement Agreement dated June 26, 2008 (the "Settlement Agreement") on the grounds of material breach and fraud. (A true and correct copy of the Settlement Agreement is attached as **Exhibit B**.) Plaintiffs also seek damages for their injuries, including, without limitation, the sum of $75,000. This amount represents the balance of a $125,000 payment made by Plaintiffs under the Settlement Agreement above the $50,000 due under the '390 Patent Purchase Agreement.

### THE PARTIES

**Plaintiffs**

3.     Plaintiff Balshe LLC ("Balshe") is a Delaware limited liability corporation with its principal place of business located within Cook County, Illinois. Balshe was formed to develop and pursue the economic opportunities relating to the '390 Patent. Because Balshe was not formed at that time, it is referred to in the '390 Patent Purchase Agreement as "Newco." All of the members of Balshe are citizens of the State of Illinois, and none are citizens of the Commonwealth of Massachusetts or the Commonwealth of Pennsylvania.

4.     The Simon Law Firm is a sole proprietorship operated by David Simon ("Simon"), with its principal place of business located in Cook County, Illinois.

**Defendants**

5.     Ross is a citizen of the Commonwealth of Massachusetts.

6.     SA is an unincorporated business entity operated by Ross with its principal place of business located at 687 Highland Avenue, Needham, MA 02494.

7.     The Meyer-Chatfield Corporation ("MC") is a Pennsylvania corporation with its principal place of business located in Jenkintown, Pennsylvania.

### JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 (diversity). There is complete diversity of citizenship, and the amount in controversy, without interests and costs, exceeds the sum or value specified by 28 U.S.C. § 1332.

For diversity purposes, Plaintiffs are citizens of Illinois and Delaware, and each of the defendants are citizens of Massachusetts and Pennsylvania.

9.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this district. Moreover, all of the parties have contractually agreed for the adjudication of their claims in this district.

FACTS COMMON TO ALL CLAIMS

**The '390 Patent**

10.     The '390 Patent was issued by the United States Patent and Trademark Office on or about October 26, 1999.

11.     The '390 Patent sets forth a system of pooling life insurance policies into a trust to create predictable income streams for the trust owners.

**Plaintiffs and the Ross Defendants Agree to the
'390 Patent Purchase Agreement**

12.     In the second half of 2007, Defendants approached Simon concerning a possible sale of the '390 Patent. When Simon and Ross first met, the Ross Defendants had failed to create a viable business to exploit the '390 Patent. Simon and his business associates, on the other hand, had tremendous expertise, contacts and experience in the insurance industry that could be leveraged to successfully exploit the '390 Patent.

13.     On or about December 30, 2007, Simon sent Ross an e-mail setting forth the preliminary terms for the purchase of the '390 Patent by Plaintiffs. On the same date, Ross responded by acknowledging that the e-mail represented an accurate summary of the parties' discussions and confirming Defendants' intention to continue negotiations with Simon.

14.     On or about January 9, 2008, Simon, his business associate Nicomedes Sy Herrera ("Herrera"), and other members of an investor group met with Ross to discuss the purchase of the '390 Patent. The parties followed up with additional meetings on February 27

3

and 28, 2008 in Chicago. During these meetings, Plaintiffs and the Ross Defendants continued to finalize the terms of the purchase of the '390 Patent by Plaintiffs.

15.     Immediately after the February 27 and 28 meetings in Chicago, the parties began to draft and revise written documents that would effectuate the sale of the '390 Patent to Plaintiffs.

16.     In March 2008, while the parties were finalizing their written agreement, Ross told Simon that he needed $25,000 of the purchase price of the '390 Patent immediately because he was broke and needed to make a payment to the Internal Revenue Service for unpaid taxes.

17.     In April 2008, the parties agreed that Balshe would purchase the '390 Patent from the Ross Defendants for $75,000 pursuant to the '390 Patent Purchase Agreement. On April 9, 2008, Simon sent a draft of the '390 Patent Purchase Agreement to the Ross Defendants *via* e-mail.

18.     Over the next few days, Ross (on behalf of himself and SA) and Simon (on behalf of Balshe and its predecessors) had numerous conversations regarding the final language of the '390 Patent Purchase Agreement.

19.     On or about April 13, 2008, Ross and Simon reached agreement on the final terms of the '390 Patent Purchase Agreement. Specifically, during a telephone conference held that day, after discussing the final terms of the agreements, Ross agreed to the terms and told Simon: "We have a deal."

20.     Simon updated the drafts of the final terms agreed to between Plaintiffs and Defendants. On or about April 14, 2008, Simon e-mailed for Ross's signature the final versions of the '390 Patent Purchase Agreement that had been agreed to by the parties during the April 13 telephone conference. (Attached as Exhibit A.)

**Plaintiffs Pay the Ross Defendants for the '390 Patent**

21.     On April 14, 2008, at Ross's request and in reliance on Ross's acknowledgment and confirmation that the parties had entered into the '390 Patent Purchase

Agreement, Simon sent to Ross by wire transfer $25,000 of the purchase price for the '390 Patent. Ross received and accepted these funds.

**Plaintiffs Pay the Ross Defendants for the '390 Patent**

22.     Shortly after receiving and accepting the $25,000 installment of the purchase price under the '390 Patent Purchase Agreement, Ross requested that the parties make additional changes to a separate consulting agreement with Balshe. None of the amendments requested by the Ross Defendants affected the material terms of the '390 Patent Purchase Agreement. Even though the parties had already agreed to the final terms of the '390 Patent Purchase Agreement, Simon agreed to consider amending the parties' agreements as a gesture of good will and to preserve an amicable working relationship.

23.     To that end, Ross, Simon and Herrera had a series of personal meetings during the week of April 21-25, 2008 concerning Ross's requested amendments. During those meetings, Ross acknowledged that the parties had already finalized the terms of their agreement and that he was requesting only minor amendments to those terms, none of which affected the purchase price of the '390 Patent under the parties' agreement.

24.     On or about April 22, 2008, Ross met with Simon and Herrera. At that meeting, Ross told Simon and Herrera that he acknowledged the fact that the parties had already reached an agreement, but that he was looking only for a few minor accommodations.

25.     On April 23, 2008, Ross and Herrera met to discuss Ross's consulting efforts on behalf of Plaintiffs. Ross told Herrera that he would introduce Plaintiffs to Wells Fargo to participate in a trust to be formed pursuant to the '390 Patent.

26.     On April 24, 2008, Herrera and Ross met to discuss Herrera's concern that Ross had failed to return the signature pages of the '390 Patent Purchase Agreement as promised. In response, Ross reassured Herrera that the parties had a deal and that he only wanted to iron out a few minor amendments (unrelated to the purchase price of the '390 Patent) with Simon before sending the signed signature pages back.

**The Ross Defendants Breach Their Obligations Under**
**The '390 Patent Purchase Agreement**

27.     Thereafter, Plaintiffs discovered that the Ross Defendants were planning to sell the '390 Patent (even though it had already been sold to Plaintiffs) to defendant MC. Plaintiff also discovered that the Ross Defendants had misappropriated and disclosed Plaintiff's confidential business plans to third parties in contravention of a confidentiality agreement between the parties.

28.     Plaintiffs filed suit against the Ross Defendants in the Circuit Court of Cook County, which issued a temporary restraining order directing Defendants to refrain from misappropriating Plaintiff's trade secrets and other confidential information. The Ross Defendants subsequently removed the action to this Court, which also issued a similarly temporary restraining order. (*See Balshe LLC v. Ross*, No. 08-CV-3256 (N.D. Illinois) ("*Balshe I*"), Docket No. 13, Attachment 1, ¶ 6)

29.     On June 26, 2008, following an evidentiary hearing, the parties, including MC, entered into the Settlement Agreement.

30.     On July 1, 2008, this Court dismissed *Balshe I* pursuant to the Settlement Agreement.

**The Ross Defendants Enter Into and Then Immediately**
**Breach Their Obligations Under The Settlement Agreement**

31.     The Settlement Agreement provides in Paragraph 2 that the Ross Defendants must "execute all necessary documents to assign ... all right, title and interest in the Patent held by Ross and [SA], and any of his/their affiliates, parents and assigns." This obligation by the Ross Defendants is a material term of the Settlement Agreement without which Plaintiffs would never have signed the Settlement Agreement. In negotiating the Settlement Agreement, Defendants also told and reassured Plaintiffs that the Ross Defendants would be excluded from any managerial and voting authority with respect to the proposed entity that would be formed to commercially exploit the '390 Patent. Defendants made these representations in response to the

explicit statements by Simon and Herrera that there could be no settlement unless Ross and SA were excluded from any voting or managerial authority with respect to such business.

32. The Ross Defendants have failed to satisfy their material obligations under the Settlement Agreement to transfer the '390 Patent to Plaintiffs or their designated affiliate. To the contrary, On December 19, 2011, the Ross Defendants recorded with the United States Patent and Trademark Office a purported ownership of the '390 Patent back to themselves. That recorded interest can be found at Reel/Frame 027468/0889.

33. The Settlement Agreement also provides in Paragraphs 4, 5 and 8 that the Ross Defendants may not have any voting interest or management authority in an entity to be formed pursuant to the Settlement Agreement to exploit the '390 Patent. The exclusion of the Ross Defendants from any managerial or voting authority was a material term of the Settlement Agreement without which Plaintiffs would never have signed the Settlement Agreement. Exclusion of the Ross Defendants from any voting or managerial authority was crucial to Plaintiffs' decision to enter into the Settlement Agreement because of the dishonesty and poor business ethics exhibited by the Ross Defendants.

34. The Ross Defendants entered into a secret side-agreement with MC to circumvent the material terms of the Settlement Agreement by giving Ross a seat on a three-member executive committee whose unanimous approval would be required for any management decisions relating to entity to be formed under the Settlement Agreement. This secret agreement effectively granted Ross absolute veto power in the management of the entity to be formed under the Settlement Agreement – even though the Settlement Agreement made clear excluded the Ross Defendants from *any* voting or managerial authority. This secret agreement was not disclosed to Plaintiffs until the parties' briefing in connection with the parties' cross-motions to enforce the Settlement Agreement in *Balshe I*. (*See Balshe I*, Docket No. 58, Ex. A)

35. Pursuant to Paragraph 13 of the Settlement Agreement, Plaintiffs paid $125,000 to Defendants. The $125,000 was paid directly to MC, which then paid the entirety of

the amount to the Ross Defendants as monetary consideration for their agreement to transfer the '390 Patent as required by the Settlement Agreement.

## FIRST CLAIM FOR RELIEF
(Injunctive Relief to Prevent Transfer of the '390 Patent)
(Against the Ross Defendants)

36.     Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 35 above as if fully set forth herein.

37.     The Ross Defendants have breached their material obligation under the '390 Patent Purchase Agreement and/or the Settlement Agreement to transfer the '390 Patent.

38.     The Ross Defendants have told Plaintiffs that they intend to exploit the '390 Patent independently of Plaintiffs through "new uses" of the '390 Patent.

39.     In or about January 2012, the Internal Revenue Service also released Private Letter Ruling 201152014, which indicated that certain competitors are attempting to develop programs that infringe the on the '390 Patent. This followed a March 2011 *ex parte* request for reexamination of the '390 Patent by the United States Patent and Trademark Office filed by a potential competitor of Plaintiffs.

40.     On December 19, 2011, the Ross Defendants purported to transfer ownership of the '390 Patent back to themselves by recording with the United States Patent and Trademark Office an interest in the '390 Patent as an assignee.

41.     Based on the foregoing, there is a substantial likelihood that the Ross Defendants will irreparably injure Plaintiffs by either transferring or licensing the '390 Patent to a third-party competitor before final adjudication of Plaintiff's claims. Indeed, prior to *Balshe I*, the Ross Defendants already tried to just that.

42.     Plaintiffs will be irreparably harmed if the relief requested herein is not granted.

43.     There is a strong likelihood that Plaintiffs will succeed on the merits of their claims against Defendants, including the Ross Defendants.

### SECOND CLAIM FOR RELIEF
(Breach of Contract – Settlement Agreement)
(Against All Defendants)

44.  Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 43 above as if fully set forth herein.

45.  Defendants have breached their material obligations under the Settlement Agreement.

46.  Defendants' breaches have deprived Plaintiffs from the material benefits they had negotiated under the Settlement Agreement and continue to injure Plaintiffs by interfering with their ability to commercially exploit the '390 Patent and adequately protect their intellectual property rights to the invention claimed in the '390 Patent from infringers and competitors.

47.  As a result of Defendants' breaches, Plaintiffs have been injured.

### THIRD CLAIM FOR RELIEF
(Fraud – Inducement of Settlement Agreement)
(Against the Ross Defendants)

48.  Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 47 above as if fully set forth herein.

49.  The Ross Defendants represented to Plaintiffs, both verbally and in the Settlement Agreement, that they would be excluded from any voting or managerial authority with respect to an entity that would be formed pursuant to the Settlement Agreement to commercially exploit the '390 Patent.

50.  The Ross Defendants have represented to Plaintiffs, both verbally and in the Settlement Agreement, that they would transfer their interests in the '390 Patent.

51.  The Ross Defendants made these representations to Plaintiffs to induce Plaintiffs to enter into the Settlement Agreement. Indeed, Plaintiffs had explicitly told Defendants that they would not agree to any settlement unless the Ross Defendants agreed to transfer the '390 Patent and that the Ross Defendants would be excluded from any voting or managerial authority.

52.     At the time that the Ross Defendants made these representations, they knew that at least one of them was false and that they had no intent to honor them. In particular, the Ross Defendants knew at the time of that they induced Plaintiffs to enter into the Settlement Agreement that they would or had already entered into a secret side-agreement to circumvent what they had promised to Plaintiffs. Moreover, the Ross Defendants knew that they had no intention of ever transferring their interests in the '390 Patent, despite the fact that they had promised to do so *twice* – first in the '390 Patent Purchase Agreement, and then in the Settlement Agreement.

53.     In making their misrepresentations, the Ross Defendants intended for Plaintiffs to rely on them. Plaintiffs did in fact reasonably rely on Defendants' misrepresentations and were injured thereby.

**FOURTH CLAIM FOR RELIEF**
(Rescission of the Settlement Agreement)
(Against All Defendants)

54.     Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 53 above as if fully set forth herein.

55.     Defendants have materially breached the Settlement Agreement so as to deprive Plaintiffs of their bargained-for consideration.

56.     Defendants procured the Settlement Agreement through fraud.

57.     In the alternative, Plaintiffs entered into the Settlement Agreement through a unilateral mistake concerning the exclusion of the Ross Defendants from any voting or managerial authority.

58.     Plaintiffs' mistake relates to the substance of the material consideration that induced Plaintiffs to enter into the Settlement Agreement. Plaintiffs were also lead by Defendants' wrongful actions into making this unilateral mistake. Plaintiffs could not have reasonably known about their mistake through the exercise of ordinary care. Finally, Defendants may easily be restored to the *status quo ante* upon rescission because they have not materially changed their circumstances since the Settlement Agreement.

59.     Enforcement of the Settlement Agreement in light of the foregoing facts would be unconscionable.

60.     Based on the foregoing, the Court should grant rescission of the Settlement Agreement and allow Plaintiffs to specifically enforce the '390 Patent Purchase Agreement. Moreover, the Court should order Defendants to pay Plaintiffs the $125,000 that Plaintiffs paid Defendants pursuant to the Settlement Agreement, which amount may be offset by $50,000 upon specific performance of the '390 Patent Purchase Agreement.

**FIFTH CLAIM FOR RELIEF**
(Breach of Contract – Specific Performance of
The '390 Patent Purchase Agreement)
(Against the Ross Defendants)

61.     Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 59 above as if fully set forth herein.

62.     The '390 Patent Purchase Agreement is valid, binding and enforceable.

63.     Plaintiffs have fully complied with all material terms of the '390 Patent Purchase Agreement and/or stand ready, willing and able to fully perform any remaining obligations due thereunder.

64.     Defendants have materially breached their obligations under the Patent Purchase Agreement and presently refuse to perform thereunder.

65.     Plaintiffs have no adequate remedy at law.

66.     Defendants' breaches have deprived Plaintiffs from the material benefits they had negotiated under the Settlement Agreement and continue to injure Plaintiffs by interfering with their ability to commercially exploit the '390 Patent and adequately protect their intellectual property rights to the invention claimed in the '390 Patent from infringers and competitors.

67.     By reason of the foregoing, the Court should order Defendants to specifically perform all of their obligations under the '390 Patent Purchase Agreement, including, without limitation, tendering to Plaintiffs all of the Ross Defendants' right, title and interest in the '390 Patent.

### SIXTH CLAIM FOR RELIEF
(Breach of Fiduciary Duty)
(Against the Ross Defendants)

68.     Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 67 above as if fully set forth herein.

69.     The Ross Defendants owed fiduciary duties to Plaintiffs including, without limitation, the duties of good faith, honesty and fair dealing as joint venturers with regard to the commercial exploitation of the Patent.

70.     The Ross Defendants have breached their duties by, among other things, refusing to transfer the '390 Patent, recording an interest in the '390 Patent to the exclusion of Plaintiffs, and seeking to exploit the '390 Patent independently of Plaintiffs.

71.     The foregoing conduct was willful, wanton and malicious, and was undertaken with callous disregard of Plaintiffs' rights and business interests.

72.     As a direct and proximate result of the foregoing wrongful conduct, Plaintiffs have suffered and continue to suffer substantial damages.

73.     To the extent SA has a separate existence from Ross, it intentionally and knowingly colluded and participated in Ross's breaches of his fiduciary duties.

74.     Plaintiffs' reliance on Ross's misrepresentations proximately caused substantial damages to Plaintiffs.

### SEVENTH CLAIM FOR RELIEF
(Unjust Enrichment – The Settlement Agreement)
(Against All Defendants)

75.     Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 74 above as if fully set forth herein.

76.     Defendants received $125,000 from Plaintiffs pursuant to the Settlement Agreement. The $125,000 was ultimately paid to the Ross Defendants in consideration for their transfer of the '390 Patent under the Settlement Agreement.

77.     Upon rescission of the Settlement Agreement, Defendants' retention of the $125,000 would violate the principles of justice, equity and good conscience.

78.     Moreover, retention by the Ross Defendants of any consideration they have received in licensing, transferring, exploiting or otherwise alienating any interests in the '390 Patent would violate the principles of justice, equity and good conscience.

79.     Therefore, a constructive trust should be enforced over the $125,000 for the benefit of Plaintiffs.

80.     A constructive trust should also be enforced over any consideration that the Ross Defendants have received in licensing, transferring, exploiting or otherwise alienating any interests in the '390 Patent.

81.     In the alternative, Defendants should be ordered to pay Plaintiffs restitution for the $125,000 plus any consideration that the Ross Defendants have received in licensing, transferring, exploiting or otherwise alienating any interests in the '390 Patent.

### EIGHTH CLAIM FOR RELIEF
(Promissory Estoppel)
(Pleaded in the Alternative Against the Ross Defendants)

82.     Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 79 except for and excluding paragraphs 61 through 67 above as if fully set forth herein.

83.     This claim for relief is pleaded in the alternative to the Fifth Claim for Relief in the event that the Court finds that the '390 Patent Purchase Agreement is not valid and enforceable.

84.     The Ross Defendants promised to transfer the '390 Patent to Plaintiffs for $75,000.

85.     The Ross Defendants expected and intended Plaintiffs to rely on their promises to induce Plaintiffs to wire $25,000 immediately.

86.     In reliance on Defendants' promise, Plaintiffs immediately wired $25,000 to the Ross Defendants. Moreover, Plaintiffs have now spent nearly $2 million and devoted thousands of hours to develop opportunities to commercially exploit the '390 Patent.

87.     Injustice can only be avoided by requiring the Ross Defendants to assign and transfer to Plaintiffs all of their right, title and interest in the '390 Patent.

NINTH CLAIM FOR RELIEF<br>(Specific Performance of the Settlement Agreement)<br>(Pleaded in the Alternative Against the Ross Defendants)

88.     Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 53 above as if fully set forth herein.

89.     This claim for relief is pleaded in the alternative to Fourth and Fifth Claims for Relief in the event that the Court finds that the '390 Patent Purchase Agreement is not valid and enforceable and/or the Settlement Agreement is not subject to rescission.

90.     Plaintiffs have fully complied with all material terms of the 'Settlement Agreement and/or stand ready, willing and able to fully perform any remaining obligations due thereunder.

91.     The Ross Defendants have materially breached their obligations under the Settlement Agreement and presently refuse to perform thereunder.

92.     Plaintiffs have no adequate remedy at law.

93.     The Ross Defendants' breaches have deprived Plaintiffs of the material benefits they had negotiated under the Settlement Agreement and continue to injure Plaintiffs by interfering with their ability to commercially exploit the '390 Patent and adequately protect their intellectual property rights to the invention claimed in the '390 Patent from infringers and competitors.

94.     By reason of the foregoing, the Court should order Defendants to specifically perform all of their obligations under the '390 Patent Purchase Agreement, including, without limitation, tendering to Plaintiffs all of the Ross Defendants' right, title and interest in the '390 Patent and enjoining them from exercising any voting or managerial authority with respect to the formation or operation of the business contemplated under the Settlement Agreement to exploit the '390 Patent.

14

95.     Under Paragraph 27 of the Settlement Agreement, the Ross Defendants are obligated to indemnify and hold Plaintiffs harmless against any loss, damage, cost or expense (including reasonable attorneys' fees) resulting from the Ross Defendants' breach of the Settlement Agreement. Accordingly, the Court should award Plaintiffs their reasonable attorneys' fees and other costs and expenses.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the entry of judgment in their favor and against Defendants as follows, as follows:

a)      Preliminarily enjoining the Ross Defendants from transferring, licensing, encumbering or otherwise alienating any interest in the '390 Patent to any party other than Plaintiffs;

b)      Ordering rescission of the Settlement Agreement;

c)      Ordering that the Ross Defendants specifically perform their obligations under the '390 Patent Purchase Agreement, including, without limitation, tendering and assigning to Plaintiffs all of their right, title and interest in the '390 Patent;

d)      Imposing a constructive trust over any consideration that Defendants have received from Plaintiffs under the Settlement Agreement;

e)      Imposing a constructive trust over any consideration that the Ross Defendants have received in licensing, transferring, exploiting or otherwise alienating any interests in the '390 Patent;

f)      Ordering Defendants to make restitution to Plaintiffs for any amounts they have been unjustly enriched;

g)      Ordering Defendants to pay compensatory damages;

h)      Ordering the Ross Defendants to pay punitive damages;

i)      Awarding Plaintiffs' attorneys' fees, expert witness fees, and costs and disbursements of suit;

j)      Awarding pre-judgment and post-judgment interest; and

k)      Ordering such other and further relief to which Plaintiffs is are deemed entitled by the Court and/or the jury.

Dated: February 10, 2012

/s/ Adam Simon_____
Adam Simon, Esq.

303 East Wacker Drive, Suite 210
Chicago, Illinois 60601

*Attorney for Plaintiffs*

# EXHIBIT A

<u>Agreement for Purchase of Pooled Benefits Trust Patent No. 5,974,390</u>

This Agreement ("Agreement") between and among Newco, Inc. ("Newco"), on the one hand, and Alan Ross ("Ross") and SAVE Associates (Ross and SAVE Associates together, "SAVE") (Newco, Ross and SAVE Associates collectively, the "Parties"), is made as of April 11, 2008.

WHEREAS, Newco intends to purchase all right, title and interest held by SAVE in Patent No. 5,974,390 for the establishment of trusts for various entity-owned life insurance (the "'390 Patent");

**NOW THEREFORE, FOR THE MUTUAL CONSIDERATION SET FORTH HEREIN, IT IS HEREBY AGREED THAT**

1.      Newco will pay SAVE $75,000 by April 10, 2008. In return, SAVE shall assign to Newco all ownership and rights to the '390 Patent held by Ross and SAVE Associates, and any of their affiliates, parents and assigns.

2.      Ross shall have the right to purchase the '390 Patent from Newco if and only if neither Newco nor any other person, entity or joint venture holding an interest in the '390 Patent, succeeds in establishing a trust and ensuring the enrollment of sufficient participants for the proper functioning of such trust within forty-eight (48) months of the effective date of this Agreement. The purchase price shall be $250,000 plus 12% interest beginning October 1, 2008.

3.      This Agreement shall be governed under the laws of the State of Illinois. The Parties consent to the jurisdiction of the state or federal courts of Illinois for the resolution of any and all disputes hereunder and agree to all legal, equitable and injunctive relief to enforce the rights and obligations under this Agreement. The Parties agree not to contest venue within either the City of Chicago.

4.      The Parties agree and acknowledge that the terms of this Agreement have been mutually negotiated between the Parties, and any rule of construction to construe ambiguous terms against the drafter is inapplicable.

5.      The Parties acknowledge that their respective rights and obligations are intended to be included in future documents to be executed by the Parties, including, without limitation, the any documents necessary to effectuate the assignment and recordation of assignment of the '390 Patent with the United States Patent and Trademark Office. The Parties therefore agree to cooperate in good faith to execute any and all necessary documents to effectuate the terms of this Agreement.

6.      Ross and SAVE Associates warrant that other than Ross and SAVE Associates, no other entity other than an affiliated entity of AXA Group, as successor in interest to the Mutual Life Insurance Company of New York, hold any title, right or interest in the '390 Patent.

7.     This Agreement may be signed in counterparts and exchanged by facsimile, with each copy having the validity as an original whole.

**IN WITNESS WHEREOF,** the Parties have executed this Agreement as of the first date set forth below.

ALAN ROSS

_____

Date:


NEWCO


By:_____
          David Simon
Its:
Date:

SAVE Associates


By:_____
          Alan Ross
Its:
Date:

2

EXHIBIT B

## SETTLEMENT AGREEMENT AND GENERAL RELEASE

This Settlement Agreement (the "Agreement") is entered into this 26th day of June, 2008 by and among: (i) Balshe LLC and The Simon Law Firm (collectively "Balshe"); and (ii) Alan J. Ross ("Ross") and SAVE Associates (Save Associates and Ross are sometimes collectively referred to as "SAVE"); and (iii) The Meyer-Chatfield Corporation ("MC") (Balshe, SAVE and MC are collectively referenced herein as the "Parties" and individually referenced as a "Party").

WHEREAS, on May 27, 2008, Balshe filed a Verified Complaint for Injunctive and Other Relief in the Circuit Court of Cook County, Illinois, styled, *Balshe LLC and The Simon Law Firm v. Alan J. Ross and SAVE Associates*, No. 08 CH 19180 (the "Action"), in which Balshe asserted, inter alia, that Ross had sold to Balshe all of his right, title and interest in United States Patent No. 5,974,390 (the "Patent");

WHEREAS, on June 5, 2008, Ross filed a Petition to Remove the Action to the United States District Court for the Northern District of Illinois, Eastern Division (the "Northern District");

WHEREAS, the Action is now pending in the Northern District as Case No. 08 CV 3256 (the "District Court Action");

WHEREAS, MC claims an interest in the Patent and the outcome of the District Court Action; and

WHEREAS, the Parties intend to settle all disputes and claims between them regarding the ownership and commercial exploitation of the Patent.

NOW, THEREFORE, in consideration of the foregoing recitals (which recitals are expressly incorporated herein by this reference), the mutual covenants contained herein, and the terms and conditions hereof, and other good and valuable consideration, the receipt and sufficiency of which consideration are hereby mutually acknowledged, the Parties hereto agrees as follows:

1.     The Parties shall form a new entity ("Newco") for the purpose of commercially exploiting the Patent through the enrollment of bank-owned life insurance ("BOLI"), carrier-owned life insurance ("IOLI"), non –BOLI and non-IOLI corporate-owned life insurance ("COLI") and/or government-owned life insurance ("GOLI") in one or more trusts (each a "PBT Trust") utilizing the Patent. The form and jurisdiction in which Newco will be organized/created shall be as mutually agreed to by Balshe and MC. The ownership and management of Newco shall be in accordance with this Agreement.

2.     SAVE and Ross shall execute all necessary documents to assign to Newco all right, title and interest in the Patent held by Ross and SAVE, and any of his/their affiliates, parents and assigns.

3.     Newco shall use its reasonable best efforts to acquire all right, title and interest in the Patent held by an affiliated entity of the AXA Group, as successor in interest to the

Mutual Life Insurance Company of New York ("AXA") (the "AXA Patent Interest"). SAVE shall exercise its option on the AXA Patent Interest on behalf of Newco and immediately assign the AXA Patent Interest to Newco. Balshe and MC shall share equally the cost of acquiring the AXA Patent Interest.

4.  SAVE shall be granted a ten percent (10%) non-voting equity interest in Newco. Balshe and MC shall each be granted a forty five percent (45%) voting equity interest in Newco. All equity interests shall enjoy tag-along rights upon the sale of Newco and subject to drag-along rights by the remaining equity interests upon a purchase offer exceeding an amount to be negotiated by the parties in good faith at a later date approximating $1 billion. Any equity interests exercising tag-along rights shall participate on a 1/3 basis if the purchase or contribution of additional equity does not result in a complete sale of Newco. The Parties acknowledge that MC may transfer a portion of its ownership interest in Newco to SAVE or other third parties.

5.  MC shall have the exclusive right to manage all aspects of Newco's involvement with BOLI with respect to any PBT Trust. Notwithstanding the foregoing, the Parties acknowledge that Balshe retains the right to negotiate with banks, including foreign banks and those that have large capital markets groups or which are primary dealers, to participate in broader strategic businesses. Balshe is free to conduct those negotiations in its sole discretion, and without MC's interference, provided that Balshe shall not enter into transaction for the creation, sale, or structure of BOLI policies, or the enrollment of BOLI policies in a PBT Trust, without MC's prior written consent, which consent shall not be unreasonably withheld.

6.  The Parties agree that Balshe shall be permitted to form a strategic relationship (a "Balshe Strategic Partner") with up to three (3) banks, provided, however, that under no circumstances will any bank which is not interested in forming a strategic partnership broader than the purchase and enrollment of BOLI policies into a PBT Trust, be a Balshe Strategic Partner. Any sales of BOLI and/or IOLI by Balshe shall be effectuated through MC and Balshe shall be entitled to BOLI and/or IOLI insurance commissions with respect to new BOLI policies and/or IOLI policies sold through MC at the highest rate that MC compensates any of its agents, and shall further be entitled to commissions relating to the replacement of any BOLI policy and/or IOLI policy owned by a Balshe Strategic Partner that reaches maturity and is replaced by MC ("Replacement Revenue"), or any BOLI policy and/or IOLI policy exchanged by a Balshe Strategic Partner through MC pursuant to Section 1035 of the Internal Revenue Code ("Exchange Revenue") at the same rate.

7.  (a)  Except as otherwise provided in subsection (b), all of Newco's net trust enrollment fees related to BOLI policies, the capture of any enhancements in the expected value of BOLI policies from the assignment of their net amount at risk (i.e. the excess of the total death benefit over the cash surrender value) ("NAR") into a PBT Trust, any net profits derived from trust renewal fees related to BOLI policies and any other net fees directly generated from the use of the PBT Trust relating to BOLI (collectively, "BOLI PBT Profits") shall be divided as follows: (a) ten percent (10%) to SAVE; (b) seventy two percent (72%) to MC; and (c) eighteen percent (18%) to Balshe.

2



(b)     BOLI PBT Profits with respect to the Balshe Strategic Partners shall be divided as follows: (a) ten percent (10%) to SAVE; (b) forty five percent (45%) to MC; and (c) forty five percent (45%) to Balshe.

(c)     Except for commission income otherwise payable to Balshe under Section 6, SAVE and Balshe each acknowledge and agree that MC shall retain all revenue related to insurance commissions and administrative fees it derives from its sale of BOLI, COLI, IOLI, GOLI, Replacement Revenue and Exchange Revenue. Balshe further acknowledges and agrees that Ross shall retain all revenue related to insurance commissions he derives from his sale of BOLI, COLI, IOLI, GOLI, Replacement Revenue and Exchange Revenue.

8.     Balshe shall have exclusive right to manage all of Newco's involvement with corporate-owned life insurance ("COLI") and government-owned life insurance ("GOLI") with respect to any PBT Trust. The parties acknowledge that MC has significant contacts with banks and other institutions and contemplate that MC will continue to maintain and develop such contacts to further the business of Newco and MC's traditional business, including the sale of BOLI and IOLI. MC shall not enter into transaction for the creation, sale, or structure of COLI and/or GOLI policies or the enrollment of COLI and/or GOLI policies in a PBT Trust, without Balshe's prior written consent, which consent shall not be unreasonably withheld.

9.     Except as otherwise provided in subsection (b), all of Newco's net trust enrollment fees related to COLI policies and/or GOLI policies, the capture of any enhancements in the expected value of COLI policies and/or GOLI policies from the assignment of their NAR into a PBT Trust, any net profits derived from trust renewal fees related to COLI policies and/or GOLI policies and any other net fees generated from the use of the PBT relating to COLI and/or GOLI (collectively, "COLI PBT Profits") shall be divided as follows: (a) ten percent (10%) to SAVE; (b) seventy two percent (72%) to Balshe; and (c) eighteen percent (18%) to MC.

(b)     In the event that Newco utilizes a methodology provided to it by MC, which methodology is similar to the methodology utilized by MC for BOLI transactions (the "MC Methodology"), MC's share of Newco's net fees generated from the use of the PBT relating to COLI and/or GOLI utilizing the MC Methodology (specifically excluding Newco's net trust enrollment fees, the capture of any enhancements in the expected value of policies from the assignment of their net assets at risk into a PBT Trust, and any net profits derived from trust renewal fees) shall be increased to: (i) forty-five percent (45%) for COLI and/or GOLI policies sold by or enrolled in a PBT Trust by MC; and (ii) twenty-seven percent (27%) for COLI and/or GOLI policies sold by or enrolled in a PBT Trust by Balshe.

10.     All of Newco's net trust enrollment fees related to IOLI policies, the capture of any enhancements in the expected value of IOLI policies from the assignment of their NAR into a PBT Trust, any net profits derived from trust renewal fees related to IOLI policies and any other net fees generated from the use of the PBT relating to IOLI shall be divided as follows: (a) ten percent (10%) to SAVE; (b) forty-five percent (45%) to Balshe; and (c) forty-five percent (45%) to MC.

3



11.    MC's and Balshe's splits of BOLI PBT Profits, COLI PBT Profits and GOLI PBT Profits set forth above shall be readjusted annually beginning on the third anniversary of the date of creation of Newco, based upon the proportion of policies enrolled by Balshe and MC in the PBT Trust(s), provided, however, that in no event shall: (i) MC's interest in BOLI PBT Profits or Balshe's interest in COLI PBT Profits and GOLI PBT Profits ever fall below 45%; and/or (ii) Balshe's interest in BOLI PBT Profits or MC's interest in COLI PBT Profits and GOLI PBT Profits ever fall below 9%. Moreover, no readjustments shall be made to a party's percentage interest once such party has enrolled a minimum of 25,000 lives in the PBT Trust. MC and Balshe each acknowledge and agree that no adjustment shall ever be made to SAVE's 10% non-voting interest in BOLI PBT Profits, COLI PBT Profits, IOLI PBT Profits and GOLI PBT Profits unless previously sold pursuant to Par. 4 hereof.

12.    MC and SAVE acknowledge and agree with Balshe that banks or companies that decide to assign the NAR of any policies held by them into a PBT Trust may be given, prior to enrollment of such policies in a PBT Trust or as allowed by the PBT Trust to other settlement companies, an option for BOLI and/or option or mandate for COLI and/or GOLI, as appropriate, to sell policies on lives approximately aged 67 or older to an asset management company affiliated with Balshe or other third-party investors (an "Age Policy"). MC and SAVE acknowledge and agree that Balshe shall retain all revenues relating to the purchase or sale of an Age Policy. MC agrees that it will not dissuade any banks from selling an Age Policy to such asset management company or other third-party investors. Balshe agrees that it will keep any Age Policy that is a BOLI policy that is purchased by Balshe or an asset management company affiliated with Balshe and is being serviced by MC in full force and effect and that MC will continue to administratively service such policies at its best price applicable for other policies, or at an arm's length market-competitive price, whichever is lower. Balshe further agrees that any Age Policy that is being serviced by MC and is sold to a third-party investor, that such Age Policy will not be exchanged pursuant to Section 1035 of the Internal Revenue Code. In the event that administrative servicing on any Age Policy that is serviced by MC is transferred to another administrator, either by Balshe, its affiliates, or a third-party investor, Balshe shall reimburse MC for the net profit lost by MC as a result of the transfer of the administrative servicing based on MC's prices or an arm's-length market-competitive price, whichever is lower. For the sake of clarity, the Parties acknowledge and agree that the purpose of this Section is to reimburse MC for loss of its servicing revenue or residual commissions for policies which are purchased or sold to an asset management company affiliated with Balshe or other third-party investors and that nothing herein should be construed to permit MC to recover revenue it would not otherwise have obtained, such as, for example and illustrative purposes only, if the Age Policy would have otherwise matured, or if MC would not have otherwise received administrative servicing fees were the policy not an Age Policy.

13.    On or before July 31, 2008, Balshe shall pay MC $125,000 to reimburse MC for half of MC's out of pocket costs. Balshe shall be entitled to the use of any illustration systems developed by MC relating to the exploitation of the Patent.

14.    The Parties agree to share on a 50%/50% basis between Balshe and MC all expenses incurred after the date of this Agreement, which are necessary to develop the business of Newco, including, without limitation, the procurement of additional patents.

4



Otherwise, the Parties agree to bear their own expenses, including, but not limited to, offices and overheard relating to their separate offices and marketing operations, and owner-related expenses.

15.    Each party to this Agreement covenants to each other party to this Agreement that it will not take any action that will harm or damage the PBT Trust. For the sake of clarity, the Parties acknowledge that activities contemplated by this Agreement shall not be construed as harming or causing damage to the PBT Trust.

16.    Balshe LLC, Simon Law Firm, STP Enterprises, Inc., David Simon, Nicomedes Sy Herrera, Pierre Wolf, David Henritze, Robert Stuchiner and Corridor Capital Group Holdings LLC, on behalf of itself/themselves and each of its/their respective shareholders, officers, directors, employees, agents, subsidiaries, affiliates, heirs, legal representatives, attorneys, executors, beneficiaries, trustees, administrators, successors and assigns predecessors, successors and assigns and all of its/their affiliated organizations and entities (the "Balshe Releasors") forever release and discharge Ross, SAVE, Bennett Meyer and MC, and each of his/its/their respective shareholders, officers, directors, employees, agents, attorneys, subsidiaries, affiliates, heirs, legal representatives, executors, beneficiaries, trustees, administrators, successors and assigns (the "Paragraph 16 Releasees"), of and from any and all duties and obligations and all claims, demands, actions or causes of action, debts, sums of money, accounts, damages, judgments and demands whatsoever, whether at law or in equity, whether presently known or unknown, whether matured, unmatured, potential or contingent, and whether in tort, in contract, or otherwise (the "Claims"), which the Balshe Releasors ever had, now have or may have, or hereafter can, shall or may have against of the Paragraph 16 Releasees, for, upon, or by reason of any action, cause, matter or thing, whatsoever, from the beginning of time to the date hereof; provided, however, that nothing herein shall release, remise, remit, discharge or in any way affect any actions, causes of actions, suits, debts, dues, damages, sums of money, accounts, covenants, contracts, controversies, agreements, loans, promises, executions, judgments, claims, demands or defenses that all or any of the Balshe Releasors may assert against a Paragraph 16 Releasee for the breach by such Paragraph 16 Releasee of any of his/its representations, warranties, covenants, agreements and obligations under this Agreement. The foregoing release, when pleaded, shall be and constitute a complete defense to any proceeding of any kind that violates its terms.

17.    Ross and SAVE on behalf of himself/itself/themselves and each of his/its/their respective shareholders, officers, directors, employees, agents, subsidiaries, affiliates, heirs, legal representatives, attorneys executors, beneficiaries, trustees, administrators, successors and assigns predecessors, successors and assigns and all of its/their affiliated organizations and entities (the "SAVE Releasors") forever release and discharge Balshe LLC, Simon Law Firm, STP Enterprises, Inc., David Simon, Nicomedes Sy Herrera, Pierre Wolf, David Henritze, Robert Stuchiner and Corridor Capital Group Holdings LLC and each of its/their respective shareholders, officers, directors, employees, agents, attorneys, subsidiaries, affiliates, heirs, legal representatives, executors, beneficiaries, trustees, administrators, successors and assigns (the "Paragraph 17 Releasees"), of and from any all Claims, which the SAVE Releasors ever had, now have or may have, or hereafter can, shall or may have against of the Paragraph 17 Releasees, for, upon, or by reason of any action, cause, matter or thing, whatsoever, from the

5

beginning of time to the date hereof; provided, however, that nothing herein shall release, remise, remit, discharge or in any way affect any actions, causes of actions, suits, debts, dues, damages, sums of money, accounts, covenants, contracts, controversies, agreements, loans, promises, executions, judgments, claims, demands or defenses that all or any of the SAVE Releasors may assert against a Paragraph 17 Releasee for the breach by such Paragraph 17 Releasee of any of his/its representations, warranties, covenants, agreements and obligations under this Agreement. The foregoing release, when pleaded, shall be and constitute a complete defense to any proceeding of any kind that violates its terms.

18.    MC and Bennett Meyer, on behalf of itself/himself/themselves and each of his/its/their respective shareholders, officers, directors, employees, agents, subsidiaries, affiliates, heirs, legal representatives, attorneys, executors, beneficiaries, trustees, administrators, successors and assigns predecessors, successors and assigns and all of its/their affiliated organizations and entities (the "MC Releasors") forever release and discharge Balshe LLC, Simon Law Firm, STP Enterprises, Inc., David Simon, Nicomedes Sy Herrera, Pierre Wolf, David Henritze, Robert Stuchiner and Corridor Capital Group Holdings LLC and each of its/their respective shareholders, officers, directors, employees, agents, attorneys, subsidiaries, affiliates, heirs, legal representatives, executors, beneficiaries, trustees, administrators, successors and assigns, (the "Paragraph 18 Releasees"), of and from any Claims, which the MC Releasors ever had, now have or may have, or hereafter can, shall or may have against of the Paragraph 18 Releasees, for, upon, or by reason of any action, cause, matter or thing, whatsoever, from the beginning of time to the date hereof; provided, however, that nothing herein shall release, remise, remit, discharge or in any way affect any actions, causes of actions, suits, debts, dues, damages, sums of money, accounts, covenants, contracts, controversies, agreements, loans, promises, executions, judgments, claims, demands or defenses that all or any of the MC Releasors may assert against a Paragraph 18 Releasee for the breach by such Paragraph 18 Releasee of any of his/its representations, warranties, covenants, agreements and obligations under this Agreement. The foregoing release, when pleaded, shall be and constitute a complete defense to any proceeding of any kind that violates its terms.

19.    This Agreement contains the entire agreement between the Parties relating to the rights herein granted and the obligations herein assumed, and completely merges and supersedes any prior written or oral agreements or representations between the Parties concerning the subject matter hereof. Any oral representation or modification concerning this Agreement shall be of no force or effect. This Agreement can be modified only by a writing signed by all of the parties to this Agreement. All Parties warrant that no statement, promise, representation, warranty, condition, inducement or agreement of any kind with respect to the subject matter of this Agreement shall be, or has been, relied upon by the respective Party unless specifically contained and incorporated herein.

20.    This Agreement shall be governed under the laws of the State of Delaware. The parties agree that the Northern District shall retain jurisdiction to enforce or settle any disputes arising out of or relating to this Agreement and agree that they will not dispute jurisdiction in the Northern District.

6



21.     Each Party has participated in, cooperated in, or contributed to the drafting and preparation of this Agreement. In any construction of this Agreement, this Agreement shall not be construed for, or against, any Party, but shall be construed fairly according to its plain meaning.

22.     The Parties acknowledge that their respective rights and obligations are intended to be included in future documents to be executed by the Parties, including, without limitation, the documents necessary for the formation and governance of Newco and any documents necessary to effectuate the assignment and recordation of assignment of the Patent with the United States Patent and Trademark Office. The Parties agree to cooperate in good faith to execute any and all necessary documents to effectuate the terms of this Agreement.

23.     Ross and SAVE Associates warrant that they have not assigned any right, title or interest in the Patent to any person or entity other than AXA, and that they have no reason to believe that AXA has transferred any or all of its right, title or interest in the Patent to any other person or entity. Balshe warrants that it has not assigned any right, title or interest in the Patent to any person or entity. MC warrants that it has not assigned any right, title or interest in the Patent to any person or entity.

24.     The Parties shall seek and obtain, as soon as practicable, the dismissal with prejudice of the District Court Action, including all claims and counterclaims made therein, with each Party to bear its/his own costs and attorney fees.

25.     The provisions of this Agreement are severable. If any provision of this Agreement is declared invalid or unenforceable by a tribunal of competent jurisdiction, the ruling will not affect the validity and enforceability of any other provision of the Agreement.

26.     The Parties may disclose the terms of this Agreement as reasonably necessary to satisfy all applicable laws and pre-existing contractual obligations or in enforcement of this Agreement; otherwise the terms of this Agreement shall be held as strictly confidential information.

27.     Each party to this Agreement agrees to indemnify and hold each of the other parties to this Agreement harmless from and against any loss, damage (including incidental and consequential damages), deficiency, cost, expense (including costs of investigation and reasonable attorneys' fees) claims, actions or judgments, whether or not involving a third-party claim, resulting from: (i) its breach of any representation or warranty contained in this Agreement; and (ii) its failure to perform any of its obligations under this Agreement or any other agreement contemplated by this Agreement.

**[The remainder of this page is intentionally left blank.]**

7



BALSHE LLC

By: _____

 

 

Title: _____

Dated: _____

THE SIMON LAW FIRM

By: _____

Title: _____

Dated: _____

_____

Alan R. Ross

 

Dated: _____

SAVE ASSOCIATES

By: _____

Title: _____

Dated: _____

MEYER-CHATFIELD CORP.

By: _____

Title: _____

Dated: _____



The undersigned hereby execute and join in this Agreement solely for the purpose of effectuating the Releases contained in Sections 16, 17 and 18.

CORRIDOR CAPITAL GROUP
HOLDINGS LLC

By: _____         _____

                                                       Bennett S. Meyer

Title: _____        Dated: _____

Dated: _____

STP ENTERPRISES, INC.

By: _____

Title: _____

Dated: _____

_____
Pierre Wolf

Dated: _____

_____
Nicomedes Sy Herrera

Dated: _____

_____
David Simon

Dated: _____

9

Robert Stuchiner

Dated: 6-30-08

_____

David Henritze

Dated: _____